**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**


REBECCA M. MURPHY,                    )

                                         )

             Plaintiff,           )

                                           )    Case No. 10-CV-694-GKF-TLW

v.                                    )            Base File

                                           )    Case No. 11-CV-274-GKF-TLW

SAMSON RESOURCES COMPANY,       )           (consolidated)

                                           )

             Defendant.         )


## OPINION AND ORDER

Before the court is the Motion for Summary Judgment [Dkt. #63] of defendant Samson Resources Company ("Samson").

Plaintiff Rebecca M. Murphy ("Murphy"), a former account assistant for Samson, sued her former employer alleging discrimination under the Americans with Disabilities Act ("ADA"), retaliation under the Family and Medical Leave Act ("FMLA"), disability discrimination under the Oklahoma Anti-Discrimination Act ("OADA), breach of contract and intentional infliction of emotional distress ("IIED"). Samson seeks summary judgment on all claims.

### I. Material Facts

1. Murphy applied for an Accounting Assistant position at Samson on August 31, 2006. [Dkt. #63, Ex. 1, Rebecca Murphy Dep., 77:22-23]. The employment application she signed stated that if she accepted a job with Samson, her employment would be "at will." [Dkt. #63, Ex. 2 at 5].

2. During Murphy's interview, Stacy Shipman, in Samson's Human Resources Department, discussed the company's requirement that Accounting Assistants come to work on a regular basis. [Dkt. #63, Ex. 1, 79:3-5; 12-19]. Murphy told Shipman she suffered from migraines and would have to miss time. [*Id.,* Ex. 1, 79:16-25].

3. On September 4, 2006, Murphy accepted Samson's offer of employment for the position of Accounting Assistant. She signed her name in acknowledgment that she accepted the offer "with the express understanding that if employed by Samson, I will not be employed under any employment contract, and that my employment will be "at will", as defined in my Samson Application for Employment." [*Id.,* Ex. 3, Employment Offer].

4. Brenda Bacon was Murphy's manager during the entire time she worked for Samson. [*Id.*, Ex. 1, 142:11-17]. Murphy transferred supervisors from Debra Field to Janice King ("King") on October 1, 2007. [*Id.*, Ex. 5, Employee Job Status Change].

5. Murphy, who has suffered from migraines since childhood, testified that her migraines are "completely spontaneous" and are sometimes triggered by smells, such as hot dogs, nacho cheese and cigarettes. [*Id.*, Ex. 1, 110:19-21; 111:2-8; 267:21-268:3]. Murphy testified that during her first year of employment, her migraines caused her to miss work "sometimes once a week, sometimes once a month, and it could be from one to three days. It's real spontaneous. ADA qualifies it as epilepsy, seizures. There's no way of knowing when this is going to happen." [*Id.*, Ex. 1, 87:19-88:1].

**Job Description**

6. Murphy's job description stated that "[r]egular and punctual attendance at work is an essential job function…and is necessary to your individual effectiveness….[r]egular and punctual attendance is required of all employees." [*Id.*, Ex. 4, Samson Job Description].

7. Murphy testified that her job duties included paying landman invoices, ordering office supplies, keeping "track of everything that everybody needed, and submitting [invoices] to my supervisor or the senior accountants." [*Id.*, Ex. 1, 86:19-87:2]. Murphy acknowledged some of the duties were time-sensitive. [*Id.,* 140:16-22].

8. According to the job description, an Accounting Assistant, "under close supervision, prepare[s] vouchers and journal entries to record invoices and other transactions applicable to inside operated wells and general and administrative payables and receipts." [*Id.*, Ex. 4]. The Accounting Assistant job description further notes time-sensitive job duties such as the responsibility of an Accounting Assistant to "[k]ey invoices within five days of receipt." [*Id.*].

9. Murphy received her first performance evaluation in September 2007. [*Id.*, Ex. 1, 89:15-23].

10. Murphy was allowed to "make up" time missed for unplanned absences resulting from such things as personal or family emergencies. [*Id.*, Ex. 6, Email; Dkt. #69, Ex. 8, Emails]. However, in April of 2008, Murphy's PTO balance was a negative 14 hours and King warned Murphy, "If unscheduled absences continue, an additional review will be necessary and disciplinary action may be recommended." [*Id.*, Ex. 7, 04/24/08 Email from King to Murphy].

11. Murphy testified that when her supervisor, King, was gone on vacation at some point between April and July 2008, Bacon acted as her supervisor and found out King was allowing Murphy to make up missed time. She contends that after King returned, Murphy was not allowed to make up time any more. [Dkt. #69, Ex. 1, 95:23-96:10]. This caused her anxiety and stress. [Dkt. #63, Ex. 1, 146:20-24]. As a result, she applied for a different job within Samson. [*Id.,* 145:22-25].

**Performance Issues**

12.  During her deposition on June 14, 2011, when asked to describe her job skills, Murphy stated she was exceptionally organized, good at multi-tasking, and had excellent computer skills but, "I can't say dependable.  I used to be able to say that, but not right now." [Dkt. #63, Ex. 1, 28:11-18].

13.  Also during her deposition, when asked whether regular attendance is a good thing, she stated, "I would love to attend regularly," but admitted she could not do so.  [*Id.,* 214:21-25].

14.  When asked if anyone ever came to her and told her that she had paid an invoice twice, Murphy testified, "No.  I've never been written up at Samson.  Never talked to.  Never anything."  [*Id.*, Ex. 1, 117:20-118:8].

15.  However, when shown several documents, Murphy admitted she had used the wrong codes for spread sheets, failed to pay landmen on time and incorrectly put payments into suspense.  Further, she admitted her manager, Brenda Bacon, brought these errors to her attention.  [*Id.,* 119:11-25; 149:8-11].

16.  In an email dated March 3, 2008, Accounts Payable was notified that invoice #78311 had been paid twice.  [*Id.*, Ex. 14, 3/3/08 email from Amy Arnold].  A handwritten note on the email states, "Becky Murphy processed payment on [indecipherable] from vendor and then also paid the actual invoice received the next month."  [*Id.*].

17.  On May 12, 2008, Bacon emailed Murphy, "Becky, I will be returning invoices to you that are paid from the wrong company.  Your desk manual needs to be updated."  [*Id.*, Ex. 8, 5/12/08 email from Bacon to Murphy].

18.  On August 29, 2008, King emailed Murphy that, "[d]ue to the continued volume and significance of the errors I have identified during my review of your work product, I am reducing

your self-approval authority to a maximum amount of $500.00 per voucher." [*Id.*, Ex. 9, 8/29/08 Email from King to Murphy; Ex. 1, 203:4-16].[1]

19.  Murphy testified there were probably some criticisms of her work that were valid, although she did not know "what they all are exactly." [*Id.*, Ex. 1, 265:1-11].

**Internal Job Application**

20.  On June 11, 2008, Murphy submitted to King an internal job application for a Land Technician Position at Samson. [*Id.*, Ex. 11, Internal Job Application]. King signed the application the same date. [*Id.*].

21.  Murphy testified she applied for the Land Technician job because "Brenda and Janice weren't letting me make up time anymore, and I was having horrible anxiety about the whole situation." [*Id.*, Ex. 1, 145:10-13].

22.  However, the week before submitting her internal application, Murphy requested and was granted approval to make up time on May 30-31 and June 1-2 and 4, 2008. [*Id.*, Ex. 12]. Additionally, Murphy was allowed to continue to make up time in July and August 2008. [*Id.,* Ex. 13].

23.  Plaintiff testified she had no idea whether the supervisor over the Land Technician position would have allowed her to make up time, and "was just taking a shot in the dark." [*Id.*, Ex. 1, 147:9-12].

24.  The internal job application states at the top:

> To be eligible to apply, (1) you must have occupied your current position for at least 12 months, and (2) you must have sustained consistently strong performance in your current position.

---

[1] Murphy testified that in an effort to get her performance review changed, she showed Janice some of the mistakes had been made by "Teresa." Janice was supposed to go discuss the issue with Brenda, but Murphy does not know whether this occurred. [Dkt. #69, Ex. 1, 204:5-205:7].

[*Id.*, Ex. 11].

25.  King signed the application, but Murphy testified Bacon would not.  [*Id.*, Ex. 11; Ex. 1, 148:13-19].

26. The internal job application requires the signature of the applicant's current supervisor, but not the manager's signature.  [*Id.*] However, Bacon testified her supervisors gave her internal job applications to review and send up to HR.  [Dkt. #69, Ex. 2, Brenda Bacon Dep., 102:5-9].  Bacon recalled she did not submit Murphy's internal job application to Human Resources.  [*Id.,* 102:10-13].  She testified she spoke to Murphy at the time and told her she was not comfortable submitting that form to Human Resources "because her performance was not as expected and her absence was too frequent, and our job requires that they be here and that they do their job accurately."  [*Id.,* 103:2-9].

27.  King and Bacon did not support Murphy's internal job application because of their concerns regarding her "work performance, including keying errors, coding errors, payment to wrong vendors" and "attendance issues."  [*Id.*, Ex. 15].

28.  Murphy testified that at the time she filled out the internal application for Land Technician, she had not requested or filled out any FMLA paperwork.  [*Id.*, Ex. 1, 151:12-15; 212:19-25].

## FMLA Application

29.  On June 19, 2008, Murphy submitted a Family or Medical Leave  ("FMLA") Request to Samson's Human Resources Department.  [Dkt. #63, Ex. 16, FMLA Request and Response].   The request was approved on June 28, 2008.  [*Id.*].

30. Murphy contends that Samson took away her ability to make up work on the weekends "as soon as I turned in FMLA."  [*Id.,* 123:25-124:1].  Specifically, Murphy cites notes

made by her supervisor, King, on a June 11, 2008, email from Murphy to King.  [Dkt. #69, Ex. 4, 6/11/08 Email from Murphy to King].  The hand written notes discuss Murphy's Internal Job Application.  [*Id.*].  King noted, inter alia, "Per Brenda Bacon, Becky is to use PTO for all future absences, not to be allowed to "make up" any time missed from work, not to be approved any overtime…" [*Id.*].

31.   However, there are numerous emails documenting Murphy was allowed to make up work *after* she turned in FMLA paperwork.  [Dkt. #63, Ex. 13, Emails between Murphy and King, covering time period 7/29/08-8/28/08]. The emails indicate Murphy was allowed to make up time she missed on unpaid FMLA leave, for pay.  [*Id.*].

32.   Additionally, Murphy testified King did not say anything to discourage her from filing a request for FMLA leave.  [Dkt. #63, Ex. 1, 231:18-232:4].

33.   On or about June 23, 2008, Murphy and Melissa Cromer had a conversation regarding approval of her FMLA.  [*Id.,* ex. 1, 244:22-245:9; Ex. 17, 6/24/08 memorandum from Cromer to Murphy].   A June 24, 2008, memorandum from Cromer to Murphy stated the FMLA leave would be retroactive to June 13, 2008.  [*Id.,* Ex. 17].

34.   Murphy testified that as of June 23, 2008, she was not asking for any other accommodation besides time off from work.  [*Id.,* Ex. 1, 247:9-23].  In her EEOC Questionnaire, Murphy stated:  "Time off was my only accommodation request and it was turned in via my FMLA forms.  It was approved by HR.  I also requested Short Term Disability on Sept. 2nd and it was approved also.  No denial."  [Dkt. #63, Ex. 18, EEOC Questionnaire].

35. Murphy also testified that she believes she could "exceed Samson's expectations if it gave her the "accommodation" of making up the time she missed.  [*Id.,* Ex. 1, 79:7-11].

36.  It is also Murphy's belief that when she was gone on FMLA leave, "[n]obody was doing my work but me."  [*Id.,* Ex. 1, 101:3-8].

37.  Murphy's treating specialist stated that Murphy "developed headaches as a child" and "[s]ince then, they have been episodic."  [*Id.,* Ex. 1, 321:24-322:6].

38.  Murphy's FMLA paperwork states that Murphy "may have episodes of incapacitation one or two times per month lasting one to three days."  The paperwork further states, and Murphy testified that she agreed, that she can "expect approximately 12 to 24 hours recovery after treatments."  [*Id.,*Ex. 16, FMLA Request and Response at SAMSON(M) 00875-00876; Ex. 1, 238:21-24; 240:10-16].

39.  Murphy testified that while she was at Samson, her migraines got worse because "they were harassing me about it."  [*Id.,* Ex. 1, 111:18-22].  She testified the "wish-wash of what [her] duties were," and "feeling attacked and constantly worried" triggered the headaches.  [*Id.,* 264:15-21].  However, Murphy also testified she does not always know what triggers her migraines.  [*Id.,* 273:9-11].

40.  Murphy testified she did not believe her migraines ever caused her to make any mistakes at work.  [Dkt. #63, Ex. 1, 128:4-6].  She also denied King told her she was making mistakes because of her migraine headaches; however, King tried "to collect the work I did before I'd leave for a migraine.  [*Id.,* 194:12-16].[2]

41.  An August 19, 2008, email exchange between King and Murphy shows that King encouraged Murphy to use FMLA leave when she was having a migraine so she could "rest until you feel better."  [*Id.*, Ex. 19, 8/19/08 emails from King to Murphy].  However, the emails also show that when Murphy declined to use FMLA leave, King told her she would have to provide

---

[2] Murphy also testified, "Brenda [Bacon] said I was undependable due to my migraines…" [Dkt. #69, Ex. 1, 205:24-25].

King with "all work that you process today prior to leaving the office, regardless of the usual assigned approver for the voucher, deposit or other work performed, so that I may ensure the timeliness and accuracy of the work product on this date." [Dkt. #69, Ex. 7, 8/19-8/21/08 emails between King and Murphy]. King made the same request of Murphy on August 20, 2008, when Murphy declined to use FMLA leave for a migraine. [*Id.*].

42. Murphy testified she was concerned that she was being required to account for the work she performed each day that she had a migraine. [Dkt. #63, Ex. 1, 198:10-199:11]. King told her the purpose of the requirement was to make sure that on days she left early for FMLA leave, she was evaluated only while she was at work and not while she was on FMLA leave. [*Id.,* 199:12-18].

**Performance Review**

43. Murphy believes she had a meeting with King and Melissa Cromer, Samson's Benefits Coordinator, concerning her draft 2007/2008 performance review on the last day she was actively at work at Samson, September 2, 2008. [Dkt. #63, Ex. 1, 215:18-23; 261:4-16; Ex. 10, Performance Planning and Review].

44. In the review, King criticized Murphy for failing to pay "immediate pay invoices" within the goal time limit and for processing and paying discount vendor invoices—a task King stated should have been transferred to the designated Accounting Assistant responsible for processing all discount vendor invoices. [*Id.,* Ex. 10 at SAMSON(M) 00087]. In her review, Murphy objected to both criticisms, contending that she was performing the duties correctly pursuant to her Desk Manual Job Procedure, which King and Bacon had approved, and she requested that King "consider what she felt was incorrect direction and training." [*Id.* at SAMSON(M) 00090; Ex. 1, 222:24-223:13].

45.  Murphy admitted it was her responsibility to update the manual.  [*Id.*, Ex. 1, 224:2-18].

46.  In the evaluation, King also stated:

[E]mployees are expected to exercise reasonable business acumen and decision making. If a process does not appear to make sense, an employee has a duty to ask questions for clarification and process improvements.  Moreover, it is critical that employees exhibit a willingness to continually improve and learn their positions.  Rebecca appears unwilling to accept any ownership for her performance and mistakes she has made. She continues to blame others for her work product and refused to learn from constructive feedback.  To assist Rebecca with her areas of improvement, the development plan is that I will personally train instead of the Sr. Accountant and review her work product and all associated processes and procedures.

[*Id.*, Ex. 10 at SAMSON(M) 00090].

### Testimony Regarding Migraines

47.  During her deposition on June 14, 2011, Murphy testified:

A:    I had migraines since the age of six—but not until the last two years did I acquire abdominal migraines, as well.  So now I have two different kinds.

Q:    Do you blame Samson for that?

A:    My doctors do, yes.

Q:    Which doctor does?

A:    Dr. Simmons, Dr. Weisz, and Dr. Farish.  Oh, and Dr. Rae.  Dr. Rae is the one who removed me from Samson because he felt that that was what was aggravating my migraines.

Q:    So you say Dr. Rae removed you from Samson.  What do you mean by that?

A:    Well, first, he sent them a letter asking them to not reprimand me for my migraines after I turned in FMLA.  I had the right to take off.  And putting me in those stressful situations only makes it worse.  They continued to reprimand me even after I had FMLA. So then he took me off of work to see if they would get better.  And he kept me off of work.

[*Id.,* Ex. 1, 76:17-77:10].

48. Murphy testified that Samson has been the main "stressor" causing her abdominal migraines and cyclical vomiting. [*Id.,* Ex. 1, 456:22-457:6].

49. Murphy did not file a workers' compensation claim during or after her employment for her migraine headaches, abdominal migraines, vomiting or the emotional distress allegedly caused by her migraine headaches for which she blames Samson. [*Id.,* 447:3-13].

50. According to Murphy, at the beginning of her employment with Samson, she "was able to come in or stay late on days I felt good or come in on Saturday and Sunday to make up time. And they wouldn't let me do that anymore, and it was becoming stressful. I was anxious to go to work, you know, and—anxious all around." [*Id.,* 450:12-17].

**Short Term Disability**

51. Murphy requested Short Term Disability leave beginning September 2, 2008—the same day on which her performance evaluation was scheduled. [Dkt. #63, Ex. 20, 9/16/08 Letter from Cromer to Murphy; Ex. 21, 8/29/08 Email Exchange Between King and Murphy; Ex. 1, 253:7-23].

52. Murphy understood that her FMLA and short-term disability leave ran concurrently. [Dkt. #63, Ex. 1, 251:2-11].

53. As of November 19, 2008—more than two months after starting STD—Murphy was having headaches "on a near daily basis," and averaging "five headache days a week." [*Id.,* Ex. 1, 322:23-323:10].

54. Samson's Short-Term Disability Policy ("STD Policy") provides for payment of benefits for up to 26 weeks for absences for a disability. The policy contains the following provisions:

- [S]hort-term disability (STD) Leave is an approved absence from employment when an employee is medically unable to perform assigned normal work duties

11

for more than 10 consecutive workdays due to the employee's own personal illness or injury.

- Any employee absent from work due to STD Leave must furnish a written statement from an acceptable (to Samson) physician explaining the necessity for such absence.

- A signed agreement to reimburse Samson if the employee does not return to work for the period equal to the STD Leave will be required.

- If an employee does not return to active employment after STD benefits ceases, the employee will be considered to have abandoned their job and will be terminated, unless the employee's claim for Samson's LTD (Long Term Disability) Plan is pending.

- Samson reserves the right to modify, amend or terminate this policy at any time at its discretion. The conditions of this policy do not create a contract of employment nor guarantee of employment for any period of time.

[Dkt. #63, Ex. 22, Short Term Disability Policy].

5. The STD Agreement referenced in the STD Policy contains the following language:

- This Agreement will serve as notice regarding your benefits under Samson's Short Term Disability ("STD") Policy.

- STD will be granted to commensurate with the dates indicated by the approved Physician's Certification submitted to the HR Department. Your doctor indicates you are unable to work for "at least two weeks, if not longer". Your approved STD will begin the afternoon of 9/2/08 and will continue through 9/26/08 or the date of release specified by an updated certification from your doctor. If you do not submit an updated physician's certification you will be place [sic] on a no pay status until the certification is received by the Samson HR Department.

- Per Samson's record as of close of business day September 16, 2008, you have used 4.3 weeks  of FML during this 12 month period.

- STD and FML run concurrently; therefore, if you exhaust the entire 12 weeks of FML and remain on STD your job is no longer protected as specified under the FML regulations.

- Your signature below authorizes Samson to deduct from your final pay any STD pay that is owed to Samson as a result of this Agreement. Any accrued Paid Time Off ("PTO") may be used to offset this amount.

- If you do not return to active employment after your STD benefits cease, your employment will be terminated, unless your Long Term Disability ("LTD") application is pending.

[*Id.*, Ex. 23, STD Agreement].

56. Murphy stated to Cromer that she was aware the doctor's certification for short-term disability was "time sensitive." [*Id.,* Ex. 24, 9/05/08 Email from Murphy to Cromer].

57. Murphy testified she believed Samson requested medical documentation from Dr. Simmons specifically because Simmons is the neurologist Dr. Rae was sending her to. [*Id.,* Ex. 1, 281:4-8].

58. Dr. Simmons' office was "across the street" from Murphy's residence at the time. [*Id.,* Ex. 1, 296:16-23].

59. On October 16, 2008, Dr. Simmons completed medical documentation excusing Murphy form work until November 15, 2008. [*Id.,* Ex. 1, 28:3-15; Ex. 25, Simmons Letter].

60. Murphy scanned in and emailed this note to Cromer the day after the doctor signed it. [*Id.,* Ex. 26, Murphy Email to Cromer].

61. Samson sent Murphy a letter on November 4, 2008, stating that on November 10, 2008, her "12 weeks of leave under the federal FMLA will exhaust." [*Id.,* Ex. 1, 248:23-249:6; Ex. 27, 11/04/08 Letter from Cromer to Murphy].

62. Murphy acknowledges that she exhausted her FMLA leave. [*Id.,* Ex. 1, 417:5-14].

63. Murphy provided another note from Dr. Simmons dated November 10, 2008. [*Id.,* Ex. 29, 11/10/08 Note from Dr. Simmons; Ex. 1, 285:24-286:4]. The note stated Murphy was to be excused from work until 11-20-08 "pending tests, treatment and followup Appt. [with] specialist in Oklahoma City." [*Id.*].

64. Murphy sent Cromer an email on November 21, 2008—the day after the latest doctor's certification expired—promising that she "will get another note or letter for you next week when I meet with Dr. Simmons….I'll get a new note to you asap." [*Id.,* Ex. 1, 290:21-22; 291:10-11; Ex. 30, 11/21/08 Email from Murphy to Cromer].[3] In her email, Murphy stated she had met with the neurologist in Oklahoma City that Dr. Simmons had sent her to "and he is still going to continue to keep me off of work for now." [*Id.,* Ex. 30]. Murphy stated the Oklahoma City neurologist was "writing up his treatment plan and sending it to Dr. Simmons." [*Id.*].

65. At the time Murphy sent the November 21, 2008, email to Cromer, she had an appointment scheduled with Dr. Simmons on Wednesday, November 26, 2008. [*Id.,* Ex. 1, 291:7-16].

66. Following the November 21, 2008, email through December 1, 2008, Murphy did not submit any medical documentation excusing her absence under STD or to return to work. [*Id.,* Ex. 1, 309:4-16].

67. Murphy testified that she was aware—as of her November 26, 2008, appointment with Dr. Simmons—that she was already five days late in turning in her doctor's note excusing her from work, and waited an additional five days after receiving the note on November 26,

---

[3] Murphy asserts the note "specifically provides Plaintiff is to remain off of work until November 20, 2008 *and until she received treatment from a specialist in Oklahoma City.*" [Dkt. #69, Plaintiff's Additional Material Fact ¶28] (emphasis added). However, in her deposition, Murphy testified the note took her off work until November 20, 2008. [Dkt. #63, Ex. 1, 285:23-286:2]. Additionally, as noted above, her November 21, 2008, email acknowledged the need to obtain a doctor's note to extend the STD. [Dkt. #63, Ex. 30, 11/21/08 Email from Murphy to Cromer]. Further, at the start of her STD, in email correspondence between Cromer and Murphy, Murphy asked, "You are needing [the doctor] to state that I am not to return to work at all, and you are looking for an approximate date in which I am expected to be able to return. Is that correct? I don't want to miss anything since this is time sensitive…"; and Cromer responded, "In regards to short term disability … the doctor's note needs to clearly identify that the employee is not able to return to work, with both the onset date *and the estimated date of return.*" [Dkt. #63, Ex. 24, 9/5/08 Emails Between Cromer and Murphy] (emphasis added).

2008, to give it to Samson.  [*Id.,* Ex. 1, 298:12-20].[4]  She testified she walked to Dr. Simmons' office on that date.  [*Id.,* 296:16-23].  She testified she could not hand deliver the note to Samson on November 26 because she was without a vehicle.  [*Id.,* 296:24-297:2].  She admitted she could have had her husband take her to Kinko's after work and faxed the doctor's note to Samson, and Samson's fax machine would show the fax had arrived on November 26.  [*Id.,* 297:5-20].

68.  On December 1, 2008, at 3:52 p.m., Murphy emailed Cromer, stating that her husband "will be bringing in a new note from my neurologist tomorrow," and stating,  "[s]orry I didn't get it to you last week—my appointment wasn't until Wednesday."  [*Id.*, Ex. 32, 12/01/08 Email from Murphy to Cromer].  Murphy testified that her practice was to have her husband, who worked at Samson, take the doctor's note excusing her from work to Samson the day after she had seen Dr. Simmons.  [Dkt. #63, Ex. 1, 282:13-19].  She did this because that is what Samson required.  [*Id.,* 283:1-4].  Samson time records establish her husband worked at Samson November 26, 30 and December 1.  [*Id.,* Ex. 31, Time Records for Brian Murphy].

69.  At 4:28 p.m. on December 1, 2008, Cromer responded to Murphy, "[b]ecause we have not heard from you, we have sent the attached letter via FedEx to your home address.  After you have had an opportunity to review, please call me if you have any questions."  [*Id.,* Ex. 32].

70.  The letter attached to Cromer's email dated December 1, 2008, terminated Murphy's employment effective November 20, 2008.  [*Id.,* Ex. 33; Ex. 34].

71.  Murphy believes Samson misinterpreted the situation, but she did not try to contact Samson and rectify its assessment of Murphy's action because "they have their agreement.  They have lots of lawyers.  I didn't need any more stress."  [*Id.*, Ex. 1, 319:4-16].

---

[4]Thanksgiving was Thursday, November 26, 2008.

72.  On December 2, 2008, a doctor's note dated November 26, 2008, was emailed from rmurphy@samson.com requesting that Murphy be excused from work until December 10, 2008. [*Id.,* Ex. 45].

73.  When asked in her deposition why she thought she had been terminated from Samson, Murphy's response was, "I'm not real sure.  I just think they didn't think I really had migraines and maybe they just didn't want to deal with me and want me coming back."  [*Id.,* Ex. 1, 422:10-14].  She identified no other reasons for her termination.  [*Id.,* Ex. 1, 423:21-23].

74.  Murphy testified neither her supervisor (King) nor her manager (Bacon) told her they did not believe she had migraines.  [*Id.,* 422:15-21]. She stated she had no evidence they did not believe she had migraines "other than just how they acted about it."  [*Id.*].

75.  When asked if she considered herself disabled, Murphy testified, "[n]ot permanently, no."  [*Id.,* 429:25-430:2].

76.  Murphy never applied for long-term disability.  [*Id.,* 430:3-5].

### Murphy's History Subsequent to Samson Employment

77.  Murphy testified that after her employment at Samson ended, she applied for work at temporary agencies, such as Manpower and AccounTemps, and for full-time forty hour a week positions at Williams, ONEOK and Helmerich & Payne.  [*Id.,* 388:17-390:11].

78.  On January 5, 2009, Murphy's Oklahoma Employment Security Commission ("OESC")  "Medical Statement"  setting forth her "Ability to Work" states that Dr. Simmons released her as "able to work" on January 5, 2009.  On the same document, in response to the question, "is this person able to engage in the usual type work," someone—allegedly Dr. Rae— checked "yes."  [Dkt. #63, Ex. 35].

79. Murphy testified she believed she could do "part-time" work around January 2009, but does not know if she could work 10-20 hours a week. [Dkt. #63, Ex. 1, 408:2-410:7].

80. In Murphy's OESC "Initial Claim Questions/Script," Murphy admitted that she answered the question, "Are you handicapped," with "no." [*Id.,* Ex. 37; Ex. 1, 410:18-411:2]. In the same document, Murphy answered the question, "Do you have any condition or other reason that would limit or restrict your ability to work?" with "no." [*Id.,* Ex. 37; Ex. 1, 411:14-19]. Murphy testified as follows:

> Q:    Is that a true statement, though, that you don't have any condition that would affect your ability to work?
>
> A:    It would depend on how they asked me. If they asked me if I had any condition other than the migraines that my doctor was writing a letter about, then I would have said no.
>
> Q:    But just reading the question, I mean, it's not limited to other than migraines. It just says—
>
> A:    That's why I said if someone was asking me these questions, I would have questioned them about that: Does that include—you know, so I don't, I don't know how to answer that.

[*Id.,* 411:23-412:10].

81. In her OESC application in January 2009, Murphy stated she could start work immediately. [*Id.,* 412:11-20].

82. Contrary to her statements on the OESC form, Murphy testified in her deposition as follows:

> Q:    Next question is "Are you available to work the same number of hours per week as your last?" And the block is checked "Yes". Then below that, "How many hours per week did you work on your last job?" And it says "40". So let me ask you a question: Did you tell these people you were able to work 40 hours a week?
>
> A:    I don't remember saying that. I don't know.

Q:     Well, you weren't able to work 40 hours a week, were you, at this time?

A:     No.

[*Id.,* 413:9-18; Ex. 37].

## Current Medical Condition

83.     At the time of her deposition in June 2011, Murphy testified she feels like she could work "probably three days a week.  But I can't tell you what three days that would be."  [*Id.,* Ex. 1, 24:6-8].  She did not believe she could perform a five-day-a-week job.  [*Id.,* 24:12-15].  She believed she could work three full days a week for eight to 10 hours a day.  [*Id.,* 24:16-23].  She also testified she believed "if somebody would let me, I could do a full-time job because I'm able to make up—when I know I'm feeling good, I can do the work.  And I've always been able, since I was in school I've had this, and I always had to overcompensate."  [*Id.,* 24:24-25:5].

84.     However, Murphy's medical records, dated June 28, 2011, state that Murphy "now has an almost daily headache and more than 15 days per month with headache associated with photophobia (discomfort or pain to the eyes due to exposure to light)."  [*Id.,* Ex. 38, 6/28/11 Office Visit Report of Michael Weisz, M.D.].  Murphy believes this is an accurate statement. [*Id.,* Ex. 1, 471:6-24].

85.     Medical records show that in July 2011, Murphy had a headache for over a month. [*Id.,* Ex. 1, 472:25-473:12].

86.     When asked if she was seeking any work currently, Murphy responded that she would like to do "pet sitting" for "people who are on vacation."  [*Id.,* Ex. 1, 387:11-16].

87.     Murphy testified she still gets migraines and they keep her from pursuing any employment that requires her to keep regular hours.  [*Id.,* Ex. 1, 387:25-388:5].

**After Acquired Evidence**

88.  Prior to Samson, Murphy worked at S&S Wealth Management from February 2005 until January 1, 2006.  [*Id.,* Ex. 1, 32:13-15; 32:19-33:3; 38:13-17; Ex. 40, S&S Termination Record].

89.  On the application for employment at Samson, dated August 31, 2006, and on the resume Murphy provided Samson, Murphy stated that she worked at S&S Wealth Management from 2005 to the present.  [*Id.,* Ex. 1, 67:21-68:21; Ex. 2; Ex. 41].

90.  However, Murphy admitted during her deposition that she was not still employed at S&S Wealth Management when she applied at Samson.  [*Id.,* Ex. 1, 70:20-22].

91.  Murphy admitted later in her deposition that the reason she told Samson she was still employed at S&S Wealth Management was that she "didn't know how to even start listing temp jobs that I don't remember—there's so many of them—trying to keep up my wages."  [*Id.,* Ex. 1, 72:10-15].

92.  According to Louise Short, Murphy's former supervisor at S&S Wealth Management, Murphy walked off the job and then accused Short of being an abusive supervisor during her Oklahoma Employment Security Commission claim against S&S Wealth Management for unemployment compensation benefits.  [*Id.,* Ex. 42, Louise Short Affidavit].

93.  Before working at S&S Wealth Management, Murphy worked at MetLife doing financial transactions for brokers.  [*Id.,* Ex. 1, 43:5-15; Ex. 41, Murphy Resume].

94.  Murphy admitted in her deposition that she was not honest on her Samson application regarding the reason for leaving MetLife:

Q:  Now you listed as your reason for leaving MetLife "Company-wide layoffs made job unstable."  Is that the reason you left MetLife?

A:  Well, no, I guess it's not.  I was terminated.  But the company did have a, I

did say Darlene had left and the new manager came in.

Q:  But you were terminated from MetLife, weren't you?

A:  Yes.

[*Id.,* Ex. 1, 73:13-21; Ex. 2, Samson Job Application].

95.  When asked if she thought Samson had a right to rely on her to tell the truth in her

application, Murphy responded:

A:  Well, I mean, it was an unstable place and I was terminated for being 29
seconds late when I'd been given notes to go to the bathroom.

Q:  Why didn't you just tell [Samson] that just like you did [to] us here today?

A:  Well, I didn't feel like if they weren't going to be honest, what do I do?

[*Id.,* Ex. 1, 74:21-75:8].

96.  Before MetLife, Murphy worked at Honeywell.  [*Id.,* Ex. 1, 61:1-63:7].  According

to Murphy, she had to leave the company because they would not offer her health insurance.

[*Id.,* Ex. 1, 63:8-64:15].

97.  However, on her Samson application, Murphy stated that she left her position at

Honeywell because she was "Laid off.  Office closed."  [*Id.,* Ex. 1, 73:22-74:11; Ex. 2, Samson

Job Application].  When Samson's counsel reminded her of her earlier testimony that she "quit"

Honeywell, Murphy responded:

A:  Okay, yeah, I guess technically I quit.  But the office is closed now.  It was closed
months after it's now merged with another company.

Q:  All right.

A:  I just didn't wait for the layoff.

[*Id.,* Ex. 1, 74:7-11].

98.  Stacy Shipman, the Samson Human Resources advisor who interviewed Murphy,

stated in an affidavit:

3. During my tenure, Samson at all times implemented and enforced its policy regarding honesty in the application process, which is described on the application for employment, above the applicant's signature line. Applicants are advised in writing that they can and should ask questions regarding any inquiry posed by Samson's application; that by signing, they are certifying their responses are true and complete; and that any falsification or omission of information on the application is sufficient cause for a refusal to hire or termination of employment.

4. Had I known Ms. Murphy lied about the reasons for leaving her previous employment, Ms. Murphy would not have been hired by Samson.

5. Had I known Ms. Murphy was terminated for cause from Metlife, Ms. Murphy would not have been hired by Samson.

6. Had I known the content of Ms. Louise Short's affidavit, Ms. Murphy would not have been hired by Samson.

7. Had I known, at any time prior to the cessation of her employment on December 1, 2008, that Ms. Murphy lied on her application, I would have recommended Ms. Murphy for job termination, and pursuant to Samson's application policy, Ms. Murphy's employment with Samson would have been terminated for falsifying her employment application.

[*Id.,* Ex. 43, Stacy Shipman Affid.].

99.  Murphy testified, she was "confident that Stacy and I had that conversation." [Dkt. #69, Ex. 1, 73:11-12].

100.  The application Murphy signed and submitted to Samson states, "I agree that any misrepresentation, falsification, or omission of any facts in this application or in my employment interviews will be sufficient cause for refusal of employment or dismissal from employment in the event I am hired." [*Id.,* Ex. 2, Samson Job Application; Ex. 44].

## II. Summary Judgment Standard

Summary judgment is appropriate if the pleadings, affidavits and depositions "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify

sufficient evidence which would require submission of the case to a jury." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1402 (10th Cir. 1997).

A party opposing a motion for summary judgment may not simply allege that there are disputed issues of fact, but must support such assertions by citing to particular parts of the record, including depositions, documents, affidavits or other materials. Fed.R.Civ.P. 56(c)(1). An affidavit used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Fed.R.Civ.P. 56(c)(4). Mere conclusory allegations, without evidentiary support, do not create a genuine issue of fact. *L & M Enters., Inc. v. BEI Sensors & Sys. Co.,* 231 F.3d 1284, 1287 (10th Cir. 2000). [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

### III. Analysis

### A. ADA Discrimination Claim

The ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an … employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.*

To succeed on her claim that she was terminated in violation of the ADA, Murphy must establish a *prima facie* case by demonstrating: (1) she is disabled within the meaning of the

ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job she held; and (3) she was discriminated against because of her disability.[5] *Mason v. Avaya Communications, Inc.,* 357 F.3d 1114, 1118 (10th Cir. 2004). Murphy has the burden of raising a genuine issue of material fact on each element of her *prima facie* case. *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 2005). If Murphy establishes her *prima facie* case, Samson must state a legitimate, nondiscriminatory reason for the alleged adverse employment action. *Selenke v. Medical Imaging of Colorado,* 248 F.3d 1249, 1259 (10th Cir. 2001). If Samson meets this burden, then summary judgment is warranted unless Murphy can show there is a genuine issue of material fact as to whether the proffered reason for the employment action is pretextual. *Id.* at 1260.

### 1. *Prima Facie* Case

### a. Whether Murphy Had an ADA "Disability"

Samson does not dispute Murphy has presented evidence she is disabled within the meaning of the ADA. Murphy has suffered migraines since childhood. They occur spontaneously and unpredictably, are triggered by both known (cigarette smoke, hot dog smells) and unknown causes, and render her unable to work or drive, and caused frequent work absences. Thus, Murphy has established she had an ADA disability.

It asserts, however, that Murphy cannot establish the second or third prongs of the *prima facie* case—i.e., that she was qualified with or without accommodations to perform the essential functions of her job and that she was discriminated against because of her disability.

---

[5] This motion is decided without regard to the recently enacted ADA Amendments Act of 2008 ("ADAAA") (effective January 1, 2009) because the ADAAA does not apply retroactively. *Hennagir v. Utah Dep't of Corr.,* 587 F.3d 1255, 1262 n. 2 (10th Cir. 2009).

### b. Whether Murphy Was Qualified With or Without Accommodations to Perform the Essential Functions of Her Job

The Tenth Circuit applies a two-part analysis to determine whether a person is a "qualified individual" under the ADA. *Davidson v. Am. Online,* 337 F.3d 1179, 1190 (10th Cir. 2003). First, the court must determine whether the individual can perform the essential functions of the job. *Id.* If not, the court must then determine whether any reasonable accommodation by the employer would enable her to perform those functions. *Id.*

### (1) Whether Plaintiff Can Perform the Essential Functions of Her Job

The plaintiff bears the burden of showing she is able to perform the essential functions of her job. *Mason,* 357 F.3d at 1119, citing *US Airways, Inc. v. Barnett,* 355 U.S. 391, 400 (2002). "Essential functions" are the "fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). The ADA requires the court to consider "the employer's judgment as to what functions of a job are essential. *Mason,* 357 F.3d at 1119. [T]he essential function inquiry is not intended to second guess the employer or to require the employer to lower company standards." *Id.*

The job description for the Accounting Assistant states, under the "ESSENTIAL FUNCTIONS" heading that "regular and punctual attendance at work is an essential job function…and is necessary to your individual effectiveness and that of your work group. Regular and punctual attendance is required of all employees." [Dkt. #63, Ex. 4]. Further, the job description lists numerous responsibilities that were time-sensitive, including the tasks of keying invoices within five days of receipt, examining vouchers of drilling, completion and lease operating expenses daily, keying deposits daily or as received, keying invoices within five days of receipt. [*Id.*]. The Accounting Assistant is required to work "[u]nder close supervision." [*Id.*].

Murphy asserts she would have been able to perform her job if Samson had permitted her to make up time missed by working late or on weekends. Samson, though, contends that regular and punctual attendance was an essential function of the job; and allowing Murphy to make up missed time would have made it impossible for her to fulfill the essential function of regular and punctual attendance. Moreover, allowing Murphy to work outside of regular schedule would make it impossible for her to perform her work "under close supervision," as required in the job description.

In *Mason,* the Tenth Circuit tackled the question of whether physical attendance in the workplace is itself an essential job function. There, the plaintiff—a "service coordinator" for a global corporation specializing in communications systems—requested the employer accommodate her post traumatic stress disorder by allowing her to work from home. The employer argued the employee's physical attendance at its administration center was an essential function of the job because it was a low-level hourly position, administrative in nature, and required supervision and teamwork. *Id.* at 1120. The employer presented evidence that (1) it considered attendance at the administration center, supervision, and teamwork as essential functions of the service coordinator position, (2) all of its service coordinators work their entire shift at the administration centers, (3) it has never permitted a service coordinator to work anywhere other than an administration center, and (4) service coordinators cannot be adequately trained or supervised if they are not at the administration center. *Id.* Plaintiff, in response, relied on her own firsthand experience, asserting that she had performed the duties of service coordinator for over two years and was well aware of the job functions of the position; her job consisted primarily of working on the computer through phone and fax lines to coordinate service calls for customers; neither supervision nor teamwork were essential functions of the

position because the job description made no mention of being supervised or "teamwork" as a duty or responsibility; and "teamwork" is not essential because one of the other service coordinators could perform "teaming" duties such as covering for a co-employee on break. *Id.*

The court found Mason's own testimony that she could perform the essential functions of the service coordinator position from home was insufficient under Rule 56(c) to create a genuine issue of material fact concerning the essential functions of the position. *Id.* at 1121. It held that Mason's physical attendance at the administration center was an essential function of the service coordinator position because the position required supervision and teamwork. *Id.* at 1119, 1122. The court concluded Mason's case was not one in which the essential function inquiry must go to the jury because no reasonable jury could find for Mason applying the factors set forth in 29 C.F.R. § 1630. *Id.* at 1122.

The overwhelming weight of authority supports the conclusion that, in a work setting such as is presented here, regular and punctual attendance is an essential function. *Keoughan v. Delta Airlines, Inc.,* 1997 U.S. App. LEXIS 12232 **7-8 (10th Cir. 1997) (essential function of flight attendant's job was to show up for work when scheduled and the requested accommodation "will not allow her to perform an essential function—that is, show up for work on a regular basis"); *Thompson v. Cendant Corp.,* 130 F. Supp.2d 1255, 1260 (N.D. Okla. 2001) ("It is well settled that regular and reliable attendance is an essential job function in itself….Failure to be present for work disqualifies an employee under ADA"); *Hypes v. First Commerce Corp.,* 134 F.3d 721, 727 (5th Cir. 1998) (per curiam); *Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1047 (6th Cir. 1998); *Tyndall v. Nat'l Educ. Centers Inc.,* 31 F.3d 209, 213 (4th Cir. 1994); *Vande Zande v. Wis. Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir. 1997).

With respect to the first part of the two-part inquiry, the court concludes Murphy could not perform the essential functions of her job with or without accommodation, because she could not fulfill the essential function of punctual and regular attendance.

### (2) Whether Samson Could Reasonably Accommodate Murphy

To defeat an employer's motion for summary judgment, the employee must first demonstrate that an accommodation appears reasonable on its face. *Mason*, 357 F.3d at 1122. The burden of production then shifts to the employer to present evidence of its inability to accommodate. *Id.* If the employer presents such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence. *Id.* Whether an accommodation is reasonable under the ADA is a mixed question of fact and law. *Id.*

The court in *Mason* noted, "We have consistently held…that an employee's request to be relieved from an essential function of the position is not, as a matter of law, a reasonable or even plausible accommodation. *Id.* citing *Wells v. Shalada,* 228 F.3d 1137, 1192 (10th Cir. 2000); *Davidson v. America Online,* 337 F.3d 1179, 1192 (10th Cir. 2003); *Frazier v. Simmons,* 254 F.3d 1247, 1261 (10th Cir. 2001); *Smith v. Blue Cross Blue Shield of Kan., Inc.,* 102 F.3d 1075, 1076 (10th Cir. 1996). Further, "the ADA does not even require an employer to *modify* an existing position in order to accommodate a disabled employee." *Id.*, citing *Martin v. Kansas,* 190 F.3d 1120, 1133 (10th Cir. 2001) *overruled on other grounds, Bd. of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356 (2001) (emphasis added).

Further, where—as here—an employee continues to seek leave and it is uncertain if or when she will be able to return to work, a leave of absence is not a reasonable accommodation.

*See Cisneros v. Wilson,* 226 F.3d 1113, 1130 (10th Cir. 2000); *Valdez v. Mueller Supply Co.,*

*Inc.,* 2012 U.S. App. LEXIS 2783 (10th Cir. 2012) (unpublished).

Here, Murphy wanted Samson to dispense totally with the punctual attendance

requirement and allow the presence or absence of her admittedly frequent and unpredictable

migraines to dictate her work schedule. In light of the time sensitive nature of the tasks, and the

requirement for "close supervision," the court finds Murphy has failed to demonstrate the

requested accommodation is reasonable on its face. *See Maziarka v. Mills Fleet Farm,* 245 F.3d

675, 681-82 (8th Cir. 2001) (employee's suggested accommodation—that he be allowed to be

absent and make up the missed time later—does not provide a reasonable alternative, as the

suggestion presumes that regular, predictable attendance is not an essential function of his job;

employer is under no obligation to reallocate the essential functions of a position or to hire

additional employees or reassign existing workers in order to compensate for employee's

unexpected absences); *Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1367 (11th Cir. 2000) (a request to

arrive at work at any time and make up the missed time at the end of her shift was not a

"reasonable accommodation"); *Waggoner v. Olin Corp.,* 169 F.3d 481, 485 (7th Cir. 1999)

(request for employee who suffered from frequent seizures to miss work any time she felt she

needed to was not a "reasonable accommodation" because employer "was not obligated to

tolerate erratic, unreliable attendance or to provide an accommodation which would impose an

undue hardship on the business"). [6]

---

[6] Plaintiff relies on *Valle-Arce v. Puerto Rico Ports Authority,* 651 F.3d 190 (1st Cir. 2011), for
her proposition that a flexible schedule constitutes a reasonable accommodation. In *Valle-Arce,*
the court found the general rule that attendance is an essential function of any job was not
dispositive because the district court failed to consider evidence that the flexible schedule
plaintiff had requested would have enabled her to fulfill the essential function of attendance. *Id.*
at 200. There, plaintiff had been allowed to work a flexible schedule for several years and during
that time and had never been reprimanded for attendance. *Id.* Here, the evidence establishes that

Murphy has failed to establish the second element of a prima facie an ADA claim for failure to accommodate.  Therefore, Samson is entitled to summary judgment on the claim.

### c. Whether Murphy was discriminated against because of her disability

To establish the third element of a *prima facie* case for disability discrimination,  Murphy must present "some affirmative evidence that disability was a determining factor in the employer's decision."  *Morgan v. Hilti,* 108 F.3d 1319, 1323-24 (10th Cir. 1997).  "This burden is not onerous, but it is also not empty or perfunctory."  *Id.* (quotations and citations omitted). Murphy "must present evidence that, if the trier of fact finds it credible, and the employer remains silent, she would be entitled to judgment as a matter of law."  *Id.*

Murphy asserts Samson discriminated against her based on her disability  by (1) refusing to allow her to apply for an internal transfer, (2)  criticizing her performance in her 2008 performance review and (3) terminating her.

It is undisputed that in the months before Murphy attempted to apply for a transfer, numerous invoices were returned to her because she had paid the wrong vendors, paid vendors twice, and/or used incorrect coding.  There is no evidence—other than Murphy's own opinion— that the refusal was based on her migraines.

Thus, summary judgment for the employer on Murphy's ADA claim is also appropriate because plaintiff has failed to establish the third element of a *prima facie* ADA claim—i.e., that she was discriminated against on the basis of her disability.

---

Samson attempted to accommodate Murphy by allowing her to make up time until the end of August 2008, but that it was not working well.  Plaintiff was made aware of performance errors in numerous emails from May through August 2008; in the June 11, 2008 meeting regarding the internal job transfer; and during the meeting regarding her draft performance review.  Further, even with a flexible schedule, Murphy could not make up all the time she missed.  Her PTO balance was negative 33 hours as of June 23,  2008—before she took FMLA leave.  [Dkt. #72, Ex. 49].

### B. FMLA Retaliation Claim

Where there is no direct evidence of retaliation, the court analyzes a retaliation claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Thus, Murphy must first present a *prima facie* case of retaliation, which then shifts the burden to Samson to produce a legitimate, nondiscriminatory justification for taking the disputed employment action. *Annette v. University of Kansas,* 371 F.3d 1233, 1237 (10th Cir. 2004). If Samson satisfies this standard, the burden shifts back to plaintiff to provide evidence showing that the employer's proffered reasons are a pretext for discrimination. *Id.*

### 1. *Prima Facie* Case

To establish a *prima facie* case of retaliation, Murphy must show that (1) she availed herself of a protected right under the FMLA; (2) Samson took an action that a reasonable employee would have found materially adverse; and (3) a causal connection exists between her protected activity and the adverse employment action. *See Metzler v. Federal Home Loan Bank of Topeka,* 464 F.3d 1164, 1171 (10th Cir. 2006). It is uncontroverted that Murphy has established the first two elements of her retaliaton claim. Murphy availed herself of all 12 weeks of FMLA leave and Samson took adverse actions her by refusing to allow her to apply for an internal transfer, giving her a negative performance evaluation and ultimately terminating her. The issue, then, is whether plaintiff has established a causal connection between the protected activity and the adverse actions.

In order to establish a causal connection between her protected activity and the adverse employment actions, Murphy must proffer evidence of circumstances that justify an inference of retaliatory motive. *Annett,* 371 F.3d at 1239. Temporal proximity between the protected act and

the adverse action may suffice to demonstrate causation for the purpose of establishing a prima facie case. *Id.* at 1240.

Murphy requested FMLA leave on June 16, 2008, and was approved on or about June 24, 2011. She submitted the internal job application on June 11, 2008, before she applied for FMLA leave. Therefore, the supervisors' refusal to approve the application could not have had anything to do with the FMLA leave. However, the performance evaluation and her termination occurred after Murphy's FMLA request and serve to establish at least a prima facie showing of a causal connection between the protected activity and the adverse action. Therefore, the court finds Murphy has proffered sufficient evidence to establish a prima facie claim of retaliation, thereby shifting the burden to Samson to articulate a legitimate nondiscriminatory reason for the adverse actions.

## 2. Legitimate Nondiscriminatory Reason

Numerous emails regarding unsatisfactory work performance—many sent before Murphy requested FMLA leave—support the statements made in Murphy's draft performance evaluation. Samson's desire to correct an employee's performance deficiencies is a legitimate nondiscriminatory reason for raising these issues in her performance review.

Similarly, Samson's STD policy required a doctor's certification to extend her short term disability leave. Murphy had a doctor's certification for STD leave through November 20, 2008. When Murphy failed to return to work and did not provide a doctor's certification to extend the leave—despite promising Samson another note "next week" (November 24-November 28)— Samson had a legitimate nondiscriminatory reason to terminate her employment on December 1, 2008.

Thus, the burden shifts back to Murphy to establish the proffered reasons are pretextual.

### 3. Evidence of Pretext

Murphy argues the proffered reason for the unfavorable performance review is pretextual because she explained to King she had been trained to complete her job responsibilities in a different manner and King failed to consult Murphy's previous performance review. Additionally, Murphy contends the supervisors began scrutinizing her work, claiming she was undependable because of her migraines and "jumped at the first opportunity to terminate [p]laintiff under the guise of the STD Agreement." [Dkt. #69 at 31].

The record clearly establishes Murphy made a number of mistakes in handling and paying invoices—both before and after she took FMLA leave. Murphy characterizes the errors as insignificant. However, it is the manager's perception of the employee's performance—not the employee's subjective evaluation of her performance—that is relevant in determining pretext. *Shorter v. ICG Holdings, Inc.,* 188 F.3d 1204, 1209 (10th Cir. 1999). Further, an employer is not required to excuse an employee's unsatisfactory performance merely because it potentially relates to an employee's disability. *Hamilton v. Southwestern Bell Telephone Co.,* 136 F.3d 1047, 1052 (5th Cir. 1998) (An employee cannot "hide behind the ADA and avoid accountability for his actions").

Similarly, Murphy contends Samson should have provided her with a warning before terminating her when she failed to provide a doctor's certification for extension of her STD. The court may not ask whether Samson's reasons were "wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. Airtran Airways, Inc.,* 497 F.3d 1108, 1118-19 (10th Cir. 2007). The STD policy clearly requires a doctor's certification. Her doctor's certification expired on November 20, 2008 , and Samson had heard nothing at all from her since November 21, 2008. As of the morning of

December 1, 2008, Samson had no doctor's certification extending Murphy's leave of absence. Whether Samson acted "fairly" is not at issue. Murphy has shown no evidence of pretext in the termination.

Samson is entitled to summary judgment on Murphy's retaliation claim.

## C. Oklahoma Anti-Discrimination Act Clam

Murphy alleges she was discriminated against based on her disability under the Oklahoma Anti-Discrimination Act ("OADA"), 25 O.S. § 1302, in violation of Oklahoma public policy under *Burk v. K-Mart,* 770 P.2d 24 (Okla. 1989).

Where a plaintiff's federal discrimination claim fails, so too does her OADA claim. *See Barzellone v. City of Tulsa,* 2000 WL 339213, at *5 (10th Cir. Mar. 31, 2000) (unpublished).

Samson is entitled to summary judgment on Murphy's OADA/*Burk* tort claim.

## D.  Breach of Contract Claim

Murphy alleges Samson breached the STD Agreement by terminating her, because the doctor's certification was still in effect until Murphy was able to see a specialist in Oklahoma City.[7]  Alternately, she argues even if the certification was not in effect, the most Samson could do under the STD Agreement was place her on "no pay status."

The STD Agreement provides, "If you do not submit an updated physician's certification you will be placed on a no pay status until the certification is received by the Samson HR Department."  [Dkt. #63, Ex. 23].  Further, it states, "If you do not return to active employment

_____

[7] Samson asserts the STD Agreement was nothing more than an agreement required by Oklahoma Administrative Rule OAC 380:30-1-7(c)-(e)  to permit Samson to deduct from the employee's final pay any STD pay that is owed to Samson as a result of the agreement.

after your STD benefits cease, your employment will be terminated, unless your Long Term Disability ["LTD"] application is pending."  [*Id.*].

The STD Policy states, "Any employee absent from work due to STD Leave must furnish a written statement from an acceptable (to Samson) physician explaining the necessity for such absence."  [Dkt. #63, Ex. 22].  Further, it states, "If an employee does not return to active employment after STD benefits ceases [*sic*], the employee will be considered to have abandoned their [*sic*] job and will be terminated, unless the employee's claim for Samson's LTD (Long Term Disability) Plan is pending.  Additionally: "The conditions of this policy do not create a contract of employment nor guarantee of employment for any period of time."  [*Id.*].

The last doctor's note Murphy submitted was on a form provided by her physician's office, Neurological Associates of Tulsa, Inc.  [Dkt. #63, Ex. 29].  Murphy asserts that because the doctor not only provided a date of November 20, 2008, but also checked the "pending" line, she was excused until after the consultation with the Oklahoma City physician.

The court rejects this view.  The doctor's November 20, 2008 note about Murphy's anticipated consultation with an Oklahoma City physician did not abrogate the STD Policy and STD Agreement requirement for a *specific* return date.  The STD Policy, the STD Agreement and email communication between Cromer and Murphy make it clear Murphy understood the time sensitive nature of the doctor's excuse.

In the letter notifying Murphy of her termination, Samson recited the history of Murphy's failure to provide an updated notification.  The last doctor's certification excused Murphy from work until November 20, 2008.  Based on Murphy's communications with Cromer, it is clear she understood an updated note was required, and she stated she would submit the information the week of November 24, 2008.  Nevertheless, she failed to provide an updated certificate.  Samson

was entitled to—and did—place Murphy on a "no pay" status as of November 20, 2008. Further, the STD Policy and STD Agreement also made it clear that if an employee failed to return to work after STD had terminated, Samson could deem her job position as having been abandoned. As of December 1, 2008, a total of 11 days had passed since the certification had expired. Samson deemed that Murphy had abandoned the position and terminated her on December 1, retroactive to November 20, 2008.

The court finds Samson did not breach the STD Agreement.[8]

## E. IIED Claim

Oklahoma first adopted the tort of intentional infliction of emotional distress in *Breeden v. League of Services Corp.,* 757 P.2d 1374 (Okla. 1978). The tort requires evidence of extreme and outrageous conduct coupled with severe emotional distress. *Gaylord Entertainment Co. v. Thompson,* 958 P.2d 128, 149 (Okla. 1998). To recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Computer Publications, Inc. v. Welton,* 49 P.3d 732, 735 (Okla. 2002); *Daemi v. Church's Fried Chicken, Inc.,* 931 F.2d 1379, 1387 (10th Cir. 1991).

---

[8] Samson also argues plaintiff's claim for breach of contract should be barred by the doctrine of after-acquired evidence based on misrepresentations Murphy made in her application for employment. Courts applying Kansas law have adopted the doctrine to limit damages or completely bar breach of contract claims. *See Stouder v. M&A Technology, Inc.*, 2012 U.S. Dist. LEXIS 1367, at *33 (D. Kan. 2012) *citing Gassman v. Evangelical Lutheran Good Samaritan Soc'y.,* 933 P.2d 743, 747 (Kan. 1997). As Samson acknowledges, no Oklahoma Supreme Court or Tenth Circuit Court of Appeals cases have adopted this doctrine. The court declines to do so in this case, as the misrepresentations in Murphy's employment application have nothing to do with the STD Agreement.

The trial court acts as a gatekeeper regarding the outrageousness of the defendant's conduct and the severity of the plaintiff's distress. *Id.* The trial court's gatekeeper role with regard to the second and fourth elements of the tort of IIED ensures that only valid claims reach the jury under the appropriate legal standards. *Id.*

Regarding the "extreme and outrageous conduct" element, the Oklahoma Supreme Court has commented:

> Liability for the tort of outrage does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind....

*Eddy v. Brown,* 715 P.2d 74, 77 (Okla. 1986). (Citations and quotations omitted).

"Clearly, not every discrimination claim, whether it is based on age, race, national origin, or gender, automatically supports a claim for intentional infliction of emotional distress." *Marshall v. Nelson Electric,* 766 F.Supp.1018, 1028 (N.D. Okla. 1991) citing *Grandchamp v. United Air Lines, Inc.,* 854 F.2d 381, 384-85 (10th Cir. 1988). In order to prevail on an IIED claim based on alleged discrimination, plaintiff must show extreme and outrageous conduct on the part of the employer. *Kannady v. City of Kiowa,* 2006 WL 3452552 *7 (E.D. Okla. November 29, 2006), citing *Grandchamp.*

Murphy's evidence does not meet this standard. Inasmuch as the court has already entered summary judgment against plaintiff on her ADA discrimination and retaliation claims and her claim for breach of contract, the termination itself cannot serve as the basis for an IIED claim. *See Kannady, supra.*

## IV. Conclusion

For the foregoing reasons, Samson's Motion for Summary Judgment [Dkt. #63] is

granted.

ENTERED this 10th day of April, 2012.


GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT